IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DENNIS K. AUERSWALD, | ) | CASE NO. 3:14CV521 |
| | ) | |
| Petitioner, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| ED SHELDON, | ) | |
| | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Respondent. | ) | |

Petitioner Dennis K. Auerswald ("Petitioner" or "Auerswald") brings this habeas corpus action pursuant to 28 U.S.C. § 2254. Doc. 1. Auerswald is detained at the Toledo Correctional Institution, having been found guilty by a Medina County, Ohio, Court of Common Pleas jury of one count of aggravated murder and one count of murder. Doc. 4-1, p. 7.[1] *State v. Auerswald*, Case No. 10-CR-318 (Medina Cty. Common Pleas Ct. filed March 31, 2011). The trial court merged both counts and sentenced Auerswald to life in prison with the possibility of parole after thirty years. Doc. 4-1, pp. 8-9.

On March 7, 2014, Auerswald filed his Petition for Writ of Habeas Corpus setting forth one ground for relief. Doc. 1, p. 6. This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2. As set forth more fully below, Auerswald's sole ground for relief fails on the merits. Thus, the undersigned recommends that Auerswald's Petition for Writ of Habeas Corpus (Doc. 1) be **DENIED.**

---

[1] Doc. page citations are to ECF Doc. page numbers.

1

# I. Background

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, the state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). The petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Railey v. Webb*, 540 F. 3d 393, 397 (6th Cir. 2008).

## A. State Court Action

### 1. Underlying facts

The following summary of underlying facts is taken from the opinion of the Medina County Court of Appeals, Ninth Appellate District of Ohio:[2]

> {¶ 45} As proof that Mr. Auerswald purposely caused Mrs. Auerswald's death with prior calculation and design, the State presented the following evidence:
>
> 1. Erva Perz, a friend from Cornerstone Church, testified that on February 8, 2009, she and her husband Tom called the Auerswald residence and spoke with Mrs. Auerswald on speaker phone for over an hour. Ms. Perz described the conversation as "fun" and said "we just laughed and giggled a lot that afternoon." When asked if she ever thought Mrs. Auerswald was suicidal, Ms. Perz responded "[a]bsolutely not. Maureen loved life. She was wonderful with our church. * * * [A]nd another thing Maureen loved was her animals. She loved those cats so much. She would never leave them." Ms. Perz further testified that, during the conversation, Mrs. Auerswald said "[o]h, Dennis is here now and he'll pray with you," and then someone slammed the receiver down and the call ended.
>
> 2. When Mrs. Auerswald called back later that day, Ms. Perz testified that she sounded "apologetic" and that she prayed a "beautiful prayer" for Ms. Perz's husband Tom. Ms. Perz also testified that Mrs. Auerswald was in a great mood and that the second call[] ended pleasantly.
>
> 3. A few hours later, Mr. Auerswald called the Perz's, again on speaker phone, and just before the conversation ended said "[o]h, Maureen went up to bed now." "You need to pray for her, because she seems—she said she's very hurt, very upset, *and she said she's going to take some antifreeze*." (Emphasis added.) Ms. Perz testified that Mrs. Auerswald never mentioned anything to her about drinking antifreeze.
>
> 4. On the evening of February 9, 2009, at approximately 6:15 p.m., Mr. Auerswald allegedly found his wife lying unconscious on the floor with a gash on the right side of

---

[2] Auerswald has not demonstrated by clear and convincing evidence that the state court's findings were incorrect. Accordingly, the state court's findings are presumed correct. *See* 28 U.S.C. § 2254(e)(1); *see also Railey*, 540 F. 3d at 397.

2

her head. He did not call an ambulance or 911. Instead, he answered a telephone call from the Perz's and told them that he "just got home and [ ] found Maureen on the floor with some vodka by her." Then, he ended the telephone call in order to check his wife's vital signs. Mr. Auerswald then called the Perz's back and asked them to come from Brunswick, which is 20 minutes away, to assist with getting her to the hospital.

5. Mr. Perz testified that he questioned Mr. Auerswald as to why he did not want to call 911, and Mr. Auerswald indicated that it was due to his financial situation.

6. Mrs. Auerswald arrived at Medina General Hospital at approximately 7:41 p.m., about an hour and a half after Mr. Auerswald allegedly found her unconscious.

7. Rosa Kovach, a unit assistant in the emergency room at Medina General Hospital, testified that she asked Mr. Auerswald what happened and he responded that "he came home from work at 6 o'clock and found her like that, and she had been drinking all day." When Ms. Kovach asked why he did not call 911, he told her that "he went to his friend's house in Brunswick first and then he came here." Ms. Kovach testified that she did not smell any alcohol on Mrs. Auerswald. Further, Ms. Kovach testified that Mr. Auerswald was very calm, did not seem concerned, and did not mention anything about the possibility of Mrs. Auerswald drinking antifreeze.

8. Dr. Levine, the emergency room physician at Medina General Hospital, testified that Mr. Auerswald said his wife had been drinking and he found her unresponsive on the floor. In addition, Dr. Levine testified that Mr. Auerswald did not mention to him anything about ethylene glycol or antifreeze.

9. Ms. Perz testified that, while at Medina General Hospital, she saw Mr. Auerswald dispose of the bottle of Pepto–Bismol that he had taken from his house and that Mrs. Auerswald had been drinking from earlier that day.

10. At approximately 9 p.m., Mrs. Auerswald was airlifted to MetroHealth Medical Center for additional testing and lab work. At approximately 10 p.m., she was moved from the emergency room to the medical intensive care unit.

11. Dr. O'Shea, a physician in the medical intensive care unit at MetroHealth Medical Center, testified that upon receiving the results of Mrs. Auerswald's lab work, he thought she may have ethylene glycol poisoning. In order to be more certain, Dr. O'Shea asked Mr. Auerswald if there was anything else Mrs. Auerswald could have taken.

12. At approximately 1 a.m., Mr. Auerswald indicated, for the first time, that Mrs. Auerswald may have ingested antifreeze.

13. Dr. O'Shea testified that he recommended hemodialysis in order to attempt to filter the toxins out of Mrs. Auerswald's blood, however, Mr. Auerswald refused any further intervention.

14. Mrs. Auerswald died of acute intoxication by ethylene glycol on February 10, 2009, at approximately 4:16 a.m.

15. Detective Scott Thomas, of the City of Medina Police Department, testified that he investigated the Auerswald residence on the morning of February 10, 2009, prior to Mr. Auerswald returning home from the hospital. During his investigation, he found no obvious signs of suicide, such as a note, antifreeze inside the house, a cup or glass containing antifreeze, instructions regarding who would care for Mrs. Auerswald's seven cats, or any suspicious messages on the answering machine. Detective Thomas did, however, locate a gallon of antifreeze on the garage floor in front of Mr. Auerswald's black Toyota Solara. He testified that the antifreeze was capped and there were no spills on the garage floor.

16. Further, although Mrs. Auerswald had a head injury that needed five staples, Detective Thomas testified that there were no signs of blood anywhere in the house, including: the wood floor where she allegedly had fallen, Mr. Auerswald's clothing, or any other clothing found in the house.

17. Jared McArthur, an employee at House of Hunan, testified that in January of 2011, he delivered food to Mr. Auerswald who told him: (a) he's been accused of murdering his wife, (b) he needs to be cautious right now and watch his back, and (c) he "fucked up" and has been in jail for six months.

18. Dr. Felo, the Cuyahoga County Coroner, testified that he believes Mrs. Auerswald's manner of death to be a homicide.

{¶ 46} Additionally, the State introduced the following evidence: testimony that Mrs. Auerswald was not suicidal, testimony that on the afternoon of February 9, 2009, Mrs. Auerswald indicated: (a) she did not know why she was feeling so sick, (b) she had been trying to take her blood pressure medication, but could not keep it down, and (c) she attempted to fix her hair and do some laundry, evidence that, on the day before her death, Mrs. Auerswald was searching for employment with Brecksville Maids, testimony of marital discord and ongoing abuse by Mr. Auerswald, testimony regarding financial problems during the marriage, testimony regarding multiple life insurance policies and Mr. Auerswald's attempts to collect on certain policies just days after his wife's death, testimony of marital infidelity by Mr. Auerswald, testimony regarding several inconsistencies in Mr. Auerswald's statements regarding his wife's death, and testimony that the antifreeze found in the Auerswald residence was manufactured prior to 1994 and did not contain a bittering agent which was later added as a precaution to prevent people and animals from drinking it, thus making this particular antifreeze almost undetectable to humans.

Doc. 4-1, p. 106; *State v. Auerswald*, 2013 WL765061, at *12-14 (Oh. Ct. App. March 4, 2013).

### 2. Procedural history

4

On June 30, 2010, a Medina County Grand Jury indicted Auerswald on one count of aggravated murder, R.C. §2903.01(A), one count of murder, R.C. §2903.02(A), and one count of forgery, § 2913.31(A)(3). Doc. 4-1, pp. 3-4. Auerswald, through counsel, pleaded not guilty to all charges. Doc. 4-1, p. 5. He waived his right to a jury trial as to the forgery count and the case proceeded to trial on the remaining counts. Doc. 4-1, pp. 6, 7. On March 11, 2011, the jury found him guilty of aggravated murder and murder. Doc. 4-1, p. 7. On April 14, 2011, the trial court found him not guilty of forgery. Doc. 4-1, p. 8. The court merged the two remaining counts and sentenced Auerswald on the aggravated murder count to life in prison with possibility of parole after thirty years. Doc. 4-1, p. 8.

### B. Direct Appeal

On April 22, 2011, Auerswald, through counsel, appealed to the Ninth District Court of Appeals, Medina County. Doc. 4-1, p. 10. He raised the following five assignments of error:

> 1. The trial court violated Appellant's rights to a fair trial under the Ohio and Federal Constitutions and committed reversible error when it permitted then introduction by the state of other crimes, wrongs, or acts to show proof of Appellant's character in violation of rules of evidence 404(B) and 403 and when it permitted the state to introduce a hearsay statement contained in a 911 call.
>
> 2. The trial court violated the Appellant's right under the Sixth and Fourteenth Amendments to the Federal Constitution and his rights under the Ohio constitution to a fair trial by refusing to allow the defense to introduce evidence favorable to the appellant.
>
> 3. The trial court committed plain error when it allowed the state to introduce the testimony of a psychologist who was not competent as an expert and who offered improper opinion testimony on whether the alleged victim was "suicidal."
>
> 4. Appellant's conviction for murder and aggravated murder are not supported by sufficient evidence and are against the manifest weight of the evidence.
>
> 5. The trial court committed plain error when it allowed the deputy coroner to testify in response to a hypothetical question based on inadmissible hearsay that the manner of death was homicide.

Doc. 4-1, pp. 16-17.  On March 4, 2013, the Ohio Court of Appeals affirmed the trial court's judgment.  Doc. 4-1, pp. 106-132; *Auerswald*, 2013 WL 785061.

### C. Ohio Supreme Court

On April 17, 2013, Auerswald, through counsel, filed an appeal to the Ohio Supreme Court.  Doc. 4-1, p. 133.  In his memorandum in support of jurisdiction, Auerswald presented the following propositions of law:

> I. The Ninth District misapplied *State v. Diar*, 120 Ohio St. 3d 460 (2008), conducted improper legal analysis of Evid.R. 404(B), and failed to implement this court's three-part test in *State v. Williams*, 134 Ohio St. 3d 521.
>
> II. The denial of Mr. Auerswald's right to present a meaningful defense deprived him of his due process right to a fair trial.

Doc. 4-1, pp. 142, 150.  On July 24, 2013, the Ohio Supreme Court declined to accept jurisdiction of the appeal.  Doc. 4-1, p. 199.

On August 5, 2013, Auerswald filed a motion for reconsideration of the Ohio Supreme Court's decision.  Doc. 4-1, p. 200.  On September 25, 2013, the Ohio Supreme Court denied Auerswald's motion.  Doc. 4-1, p. 215.

### D. Federal Habeas Petition

On March 7, 2014, Auerswald, through counsel, filed his Petition for a Writ of Habeas Corpus.  Doc. 1.  He listed the following ground for relief:

> **Ground One**: The denial of Mr. Auerswald's right to present a meaningful defense deprived him of his due process right to a fair trial.
>
>> **Supporting Facts:** The defense sought to introduce testimony from Mr. Auerswald's employer (Jim Kiraly) that he had, at 9:00 AM on the date of Maureen Auerswald's death, overheard Mr. Auerswald (while in his office) exclaim over the phone "Stop drinking that stuff and call the doctor."  Maureen was at home and taking Pepto-Bismol for an ups[]et stomach.  Phone records confirmed the call.  As the prosecution theory was that Mr. Auerswald may have poisoned his wife by introducing the poison through the Pepto-Bismol*, these facts if proved to the jury would have severely discredited the State theory, as no one tells his intended victim to stop taking the poison and to go to the doctor.  The

> Court of Appeals, although agreeing that this evidence should have been allowed in, missed the point entirely and instead focused on these facts as only supporting a claim that Mr. Auerswald cared about his wife's health, which was shown elsewhere and hence deemed cumulative and harmless. While that additional purpose was present, the primary purpose of showing inconsistency with an intent to murder was much more powerful and not made cumulative by any other evidence. (*The State also later suggested other fruit juices without naming them or describing them as evidence.)

Doc. 1, p. 6. On September 11, 2014, Respondent filed a Return of Writ (Doc. 4) and Auerswald filed a Traverse (Doc. 6). Respondent argues that Auerswald's ground fails on the merits. Doc. 4, pp. 10-18.

## II. Law

### A. Standard of Review under AEDPA

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214 ("AEDPA"), apply to Auerswald's habeas petition because he filed it after the effective date of the AEDPA. 28 U.S.C. § 2254; *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007). In order to obtain habeas relief under 28 U.S.C. § 2254(d), a petitioner must show either that the state court decision (1) resulted in a decision contrary to, or involving an unreasonable application of, clearly established federal law as determined by the United States Supreme Court ("contrary to" clause); or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings ("unreasonable application" clause). *Id*.

"Under the 'contrary to' clause, a federal habeas court may grant a writ if the state court arrives at a conclusion opposite to that reached by the [United States Supreme] Court on a question of law or [based on] a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-413 (2000). Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e]

7

Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id. at 413*. "Clearly established federal law" refers to the holdings, not dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision, as well as legal principals and standards flowing from Supreme Court precedent. *Id.* at 412; *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005). A state court is not required to cite Supreme Court precedent or reflect an awareness of Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts" such precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002); *Lopez v. Wilson*, 426 F.3d 339, 358 (6th Cir. 2005). If the Supreme Court has not addressed the petitioner's specific claims, a reviewing district court cannot find that a state court acted contrary to, or unreasonably applied, Supreme Court precedent or clearly established federal law. *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

In determining whether the state court's decision involved an unreasonable application of law, the court employs an objective standard. *Williams*, 529 U.S. at 409. "A state court's determination that a claim lacks merit precludes federal habeas review so long as 'fair-minded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also Bray v. Andrews*, 640 F.3d 731, 738 (6th Cir. 2011). "A state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 562 U.S. at 103.

### III. Claim Analysis

Auerswald argues that the trial court violated his right to present a meaningful defense when it improperly excluded the testimony of his boss, Jim Kiraly, who was prepared to testify that he heard Auerswald on the phone at 9:00 a.m. on the day in question state, "Stop drinking

8

that stuff and call the doctor." Docs. 1, p. 6; 6, p. 8. Auerswald contends that this testimony would have made the state's theory of his plan to kill his wife less likely because it shows that he behaved in a way inconsistent with trying to poison and kill his wife, i.e., he would not have told her to stop drinking poison and seek medical advice. Doc. 6, p. 12. He argues that his wife had a motive to commit suicide and that "the entire case essentially boiled down to an analysis of whether Maureen's known actions during the critical day seemed consistent or inconsistent with suicide and whether Dennis Auerswald's known actions during the day seemed consistent or inconsistent with an intent to murder his wife." Doc. 6, p. 13.

In considering this claim, the Ohio Court of Appeals found that the trial court improperly excluded the evidence and then applied harmless error review:

> {¶ 29} In his second assignment of error, Mr. Auerswald argues that the trial court erred in not allowing Mr. Jim Kiraly, Mr. Auerswald's former employer, to testify that, on February 9, 2009, at 9 a.m., he overheard Mr. Auerswald state, "[s]top drinking that stuff and call the doctor," during a telephone conversation. Mr. Auerswald contends that this statement should not have been excluded as hearsay because it is not an assertion. Mr. Auerswald also contends that, if this statement is hearsay, it is admissible as an excited utterance.
>
> {¶ 30} As stated above, a trial court possesses broad discretion with respect to the admission of evidence. *Ditzler* at *2. An abuse of discretion is more than an error of judgment; it means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. *Blakemore* at 219. Further, "[d]ue process requires only 'that criminal defendants be afforded a meaningful opportunity to present a complete defense.'" *State v. Hale*, 119 Ohio St.3d 118, 2008–Ohio–3426, ¶ 46, quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984). As such, "'[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.'" *Hale* at ¶ 46, quoting *Taylor v. Illinois*, 484 U.S. 400, 410 (1988).
>
> {¶ 31} Here, in excluding Mr. Kiraly's testimony as hearsay, the trial court reasoned:
>
>> You're not using it to prove he was on the phone or using it to prove that he could speak on the phone or using it to prove that the phone was on or using it to show that he was physically present. It is the fact that he said "[s]top taking that stuff and call the doctor." I mean, that's—I can't see any other reason, other than for the truth of the matter, that he's explaining that it would be pertinent. I don't understand any other reason for it.

9

Evid.R. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." However, Mr. Auerswald's statement "[s]top drinking that stuff and call the doctor," is not hearsay because it is not an assertion. *State v. Leonard*, 104 Ohio St.3d 54, 2004–Ohio–6235, ¶ 97. "An assertion for hearsay purposes 'means to say that something is so, e.g., that an event happened or that a condition existed.'" *State v. West*, 10th Dist. No. 06AP–114, 2006–Ohio–5095, ¶ 9, quoting *Leonard* at ¶ 97, quoting *State v. Carter*, 72 Ohio St.3d 545, 549 (1995). Mr. Auerswald's statement, "[s]top drinking that stuff and call the doctor" is not an assertion, but rather a directive. It cannot be proven true or false. Because this statement cannot be offered to prove the truth of the matter asserted, the trial court incorrectly excluded this testimony as hearsay.

{¶ 32} However, even though the trial court erred in excluding this testimony as hearsay, Mr. Auerswald was not materially prejudiced by its exclusion. Mr. Auerswald's stated purpose for admission of the statement was to demonstrate to the jury that he was concerned about his wife's health and urged her to consult a doctor. This, he argues, is inconsistent with a desire to kill her. However, the jury heard a portion of Mr. Auerswald's police interview where he admitted to speaking with Mrs. Auerswald on February 9, 2009, at 9 a.m. Additionally, the jury heard Detective Thomas testify that Mr. Auerswald spoke with Mrs. Auerswald on February 9, 2009, at 9 a.m., and that she was still fighting the stomach flu and taking Pepto–Bismol. The jury also heard Mr. Kiraly testify that he heard Mr. Auerswald on the office telephone the morning of February 9, 2009. Finally, the jury heard multiple witnesses testify that Mr. Auerswald took his wife to the emergency room when he found her unconscious on the evening of February 9, 2009. This testimony arguably contradicts the State's theory that Mr. Auerswald murdered his wife, which is the very same reason Mr. Auerswald sought to introduce the statement "[s]top drinking that stuff and call the doctor." The jury, as trier of fact, could have chosen to believe that it was counter-intuitive for Mr. Auerswald to take his wife to the emergency room if he intended to proverbially "get away with murder." It stands to reason that evidence of Mr. Auerswald actually taking Mrs. Auerswald to the emergency room would be more persuasive to the jury than evidence of a co-worker overhearing a one-sided conversation between Mr. Auerswald and an unknown third-party. However, in spite of knowing that Mr. Auerswald took her to the emergency room, the jury still convicted him of aggravated murder and murder. Had the proferred testimony been admitted, it would not have changed the result of the trial.

{¶ 33} Therefore, based upon the record before us, we conclude that the trial court erred in excluding the statement, but it did not commit reversible error because Mr. Auerswald was not materially prejudiced by its exclusion.

*Auerswald,* 2013 WL 785061, at *8-10.

Auerswald strenuously urges the undersigned to apply an unarticulated standard of harmless error review amounting to a "stricter analysis" of the excluded evidence in this case than in cases involving other types of trial errors. Doc. 6, pp. 8-11. The gist of Auerswald's

10

argument is that there is no Supreme Court precedent from which to draw the proper standard of harmless error review in an exclusion of evidence case like his. *Id.* (distinguishing Supreme Court harmless error cases and citing, with approval, pre-AEDPA federal circuit cases).

A federal habeas court considers a state court's harmless error determination of a constitutional trial error under the standard set forth in *Brecht v. Abrahamson*—"whether the [complained of] error 'had substantial and injurious effect or influence in determining the jury's verdict.'" 507 U.S. 619, 623 (1993); *Davis v. Ayala,* 135 S.Ct. 2187, 2197 (2015) (when a state court applies a harmless error analysis, a habeas petitioner must show that the trial error "resulted in 'actual prejudice[,]'" quoting *Brecht*, 507 U.S.at 637); *Fry v. Pliler,* 551 U.S. 112, 119-120 (2007) (same).³ This standard applies to "constitutional error[s] of the trial type[,]" *Brecht,* 507 U.S. at 638, including the exclusion of evidence. *See Fry,* 551 U.S. at 114-116 (applying the *Brecht* standard when petitioner alleged the trial court erroneously excluded defense witness testimony regarding statements the witness heard offered to show that another individual committed the crime). Thus, *Brecht* provides the proper standard of review in this case. *Id*.

Auerswald does not show that he was actually prejudiced by the trial court's error excluding the testimony of Mr. Kiraly reporting that he heard Auerswald say, "Stop drinking that stuff and call the doctor." *See id*. at 119. As the Ohio Court of Appeals noted, there was other evidence allegedly inconsistent with Auerswald's intent to poison his wife; namely, that he drove her to the hospital when he came home and found her unconscious on the floor. *Auerswald*, 2013 WL 785061, at *9. Despite this evidence, the jury still convicted Auerswald of murder.

Moreover, the jury was presented with additional evidence that bolstered the state's theory of murder: Detective Thomas testified that Auerswald, in a recorded interview played for

---

³ The undersigned assumes, without deciding, that Auerswald's ground describing the exclusion of Kiraly's testimony adequately states a violation of Auerswald's constitutional right to present a complete defense reviewable by a federal habeas court, as Auerswald alleges.

11

the jury, stated that he spoke with his wife on the phone on February 9, 2009, and that she indicated she had been ill and had been drinking cranberry juice, water, and Pepto-Bismol. Doc. 5-8, pp. 565, 212-213. However, no cranberry juice containers were ever found in the house or in the trash and a witness testified that Auerswald threw away the Pepto-Bismol container at the hospital. Docs. 5-8, p.213; 5-9, p. 59; 5-8, p. 83; 5-3, p. 185. Auerswald arrived home from work and found his wife lying unresponsive on the floor at 6:15 p.m. Doc. 5-8, p. 103. He did not call an ambulance and instead waited before calling friends to come over to take her to the hospital. Doc. 5-3, p. 127. He arrived at the emergency room with his still-unresponsive wife about 90 minutes after finding her, at 7:41 p.m. Doc. 5-9, p. 68. He told different stories to different people explaining why he did not call an ambulance: he did not have any money (Doc. 5-7, p. 205; 5-8, p. 122); he had had a bad experience with the Medina Police (Doc. 5-8, pp.167-168); he had had a bad experience with the Medina EMS (Doc. 5-8, p. 168); and he had no insurance (Doc. 5-8, pp. 169, 174). Upon his 7:41 p.m. arrival to the hospital, Auerswald informed hospital staff that his wife had passed out from drinking alcohol all day (Doc. 5-9, p. 68); testing revealed she had no alcohol in her system. Doc. 5-9, p. 6. He neglected to inform medical personnel that she may have ingested anti-freeze until 1:00 a.m. in the morning—over five hours after his arrival at the hospital and his lie about her having drunk alcohol all day. Doc. 5-9, pp.12-14. Finally, upon confirmation of her ethylene glycol poisoning (consistent with ingesting antifreeze), Auerswald refused hemodialysis detoxification measures and had his wife classified as Do Not Resuscitate. Doc. 5-9, pp.16-17. Maureen Auerswald died three hours later, at 4:14 a.m. on February 10, 2009. Doc. 5-9, p. 63.

There was evidence of the Auerswalds' long-time and ongoing financial problems and unpaid tax debts, including nearly $40,000 in unpaid mortgage payments, a resulting foreclosure action stayed pending their filing for bankruptcy, and that Auerswald's car was about to be

12

repossessed. Docs. 5-6, pp. 178-186; 5-9, pp.132-133; 5-8, pp.144-145. Less than a week before Maureen Auerswald's death, the guarantor of the Auerswalds' mortgage had filed a motion for relief from the bankruptcy stay to permit foreclosure proceedings to continue. Doc. 5-6, pp.188-190. Auerswald had taken out at least three life insurance policies on his wife (Doc. 5-7, pp. 154-155); the day after her death he attempted to collect a $50,000 life insurance payout (Doc. 5-6, pp.141-143) as well as Social Security widower benefits (Doc. 5-9, pp. 45-46). He lied to police and told them he had only two insurance policies worth a total of about $25,000 (Doc. 5-8, pp. 123,129-130, 203); he did not tell them he had a $100,000 AIG policy he attempted to collect a month after her death in a "rush" claim packet. Doc. 5-6, pp.153, 157-158. Auerswald told different insurance companies different stories about how his wife died—natural causes and accidentally. Docs. 5-8, pp.139-140; 5-9, p. 136.

    The jury heard that, on the night Auerswald discovered his wife on the floor, he told a friend that she had fallen and hit her head and was dying. Doc. 5-7, pp. 196-197. He told an investigating law enforcement officer she died of a heart attack (Doc. 5-8, pp. 28-29) while telling another that she killed herself by drinking antifreeze (Doc. 5-8, pp. 101, 139). He told police that he did not know there was antifreeze in his garage and that he had his cars serviced at Midas. Doc. 5-8, pp. 176-177. In a recorded jail phone call, however, Auerswald stated that he services his own cars and that he knew he had antifreeze in his garage. Doc. 5-8, p. 181. On the night of his wife's death, before an investigation into her death, he told a friend with whom he stayed, "Don't tell anyone but the police said, you know, they think I gave Maureen antifreeze." Doc. 5-7, p. 187.

    The jury heard testimony that Maureen Auerswald was a battered wife who had moved into her own bedroom and "was done" with her marriage. Doc. 5-7, pp.109-113, 129-130,133-134; Doc. 5-8, p. 51. Within weeks of his wife's death, Auerswald was seeking companionship

13

with a former colleague. Doc. 5-7, pp. 87-89. And when discussing the criminal charges against him, Auerswald told a delivery person bringing food to his door, "I f***ed up and have been in jail for six months." Doc. 5-6, p. 132.

All told, given Auerswald's overwhelmingly inconsistent statements made and behavior exhibited beginning on the day he found his wife unconscious on the floor of their home, it cannot be said that the excluded evidence in this case—testimony that Auerswald stated during a phone call, "Stop drinking that stuff and call the doctor"—"had [a] substantial and injurious effect or influence in determining the jury's verdict" and caused Auerswald actual prejudice. Brecht, 507 U.S. at 623, 637. Accordingly, Auerswald's ground for relief fails on the merits and he is not entitled to habeas relief. Id.

### IV. Conclusion and Recommendation

For the reasons stated above, the undersigned recommends that Petitioner's habeas Petition be **DENIED** because it fails on the merits.

Dated: November 23, 2015

Kathleen B. Burke
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See United States v. Walters, 638 F.2d 947 (6th Cir. 1981); see also Thomas v. Arn, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).